# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

INTEX RECREATION CORP.,

    *Plaintiff/Counterclaim-Defendant*,

    v.

TEAM WORLDWIDE CORP.,

    *Defendant/Counterclaim-Plaintiff.*

CASE NO. 1:04 CV 01785
Judge:  Paul L. Friedman
Magistrate Judge:  Deborah A. Robinson

## PLAINTIFF INTEX RECREATION CORP.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S MARCH 28, 2008 ORDER PURSUANT TO LCvR 72.2(b) AND FED. R. CIV. P. 72

Gerald F. Ivey (#367009)
Kara F. Stoll (#471166)
Edward J. Naidich (#481649)
John M. Williamson (#472713)
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, DC  20001
(202) 408-4000

*Attorneys for Plaintiff/Counterclaim-Defendant*
*Intex Recreation Corp.*

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................1

II.    FACTUAL BACKGROUND .......................................................................................3

    A.    The '469 Patent Specification .................................................................3

        1.    The Socket Embodiments (One Through Seven) All Describe a Socket That Fits and Holds onto a Detachable Pump ..................................4

        2.    The "Chamber" Embodiments (Eight Through Ten) All Have a Fan and a Motor Mounted in a Nondetachable Chamber ............................7

    B.    The Prosecution History of the '469 Patent ...........................................9

        1.    During the Prosecution of the '469 Patent and Related Patents, TWW Repeatedly Defined "Pump Body" as the Pump Housing ................9

        2.    After the Patent Office Examiner Required TWW to Select Either the Chamber Claims or the Socket Claims, TWW Canceled the Chamber Claims and Pursued Only the Socket Claims ............................12

        3.    During Prosecution, Both TWW and the Examiner Consistently Equated Structures That Fit and Hold onto a Detachable Pump with the Claim Term "Socket" ..................................................................14

    C.    The Asserted Claims 14-17 of the '469 Patent .....................................15

    D.    The Accused Intex Products .................................................................16

III.    ARGUMENT ..........................................................................................................20

    A.    Standard of Review ..............................................................................20

    B.    The Magistrate Judge Explicitly Followed the Claim Construction Methodology of *Texas Digital*, Which Has Been Overruled by *Phillips* ..............20

        1.    *Phillips* Overruled the Dictionary-Based Approach of *Texas Digital* .......................................................................................................20

        2.    The Magistrate's Order Explicitly Follows the Rejected *Texas Digital* Approach to Claim Construction .................................................25

    C.    The Magistrate Judge's Order Incorrectly Construes "Pump Body" (All Claims) ..................................................................................................26

1.      The Language of the Asserted Claims Indicates That the Pump
Body Is One Component of the Pump .......................................................27

2.      The Specification of the '469 Patent Uses the Term "Body" to
Refer to an Outer Shell and the Figures of the Specification
Contradict TWW's Proposed Construction ...............................................27

3.      The Prosecution History of the '469 Patent Defines "Pump Body"
as a Housing ............................................................................................29

4.      The Ordinary Meaning of "Pump Body" as a Housing That
Surrounds the Other Components of the Pump Is Confirmed by the
Prosecution History of TWW's Closely Related Application ...................32

5.      TWW's Proposed Construction of "Main Part of the Pump" Is
Vague and Nebulous .................................................................................34

D.      The Magistrate Judge's Order Incorrectly Construes "Socket" (All Claims)........34

1.      The '469 Patent Specification and the Language of the Claims Use
the Term "Socket" to Refer to a Structure That Fits and Holds onto
a Detachable Part .....................................................................................36

        a)      The '469 Patent Claims and Specification Repeatedly
                Indicate That the Pump is "Fitted Into" the Socket and That
                the Socket Holds onto the Pump .....................................................36

        b)      The Only Disclosed "Socket" Devices in the '469 Patent
                Specification Require a Detachable Connection...........................37

        c)      In the Context of the '469 Patent Specification, a "Socket"
                Is Fundamentally Different from a "Chamber" ...........................39

2.      The Prosecution History of the '469 Patent Further Demonstrates
That the Ordinary Meaning of "Socket" in the Context of the '469
Patent Is a Structure That Fits and Holds onto a Detachable Part ...........41

3.      The '469 Patent Prosecution History Supports Intex's Proposed
Construction That the Claimed "Socket" Is a Structure That Fits
and Holds onto a Detachable Pump..........................................................44

4.      Extrinsic Evidence, Such as Pertinent Dictionary Definitions,
Lends Further, Secondary Support for This Construction of
"Socket". ..................................................................................................45

5.      TWW's Construction Is Not Supported By The Claim Language in
a Different Patent, as TWW Advocates....................................................45

IV.     CONCLUSION.................................................................................................47

## TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Novopharm Ltd.*,
    323 F.3d 1324 (Fed. Cir. 2003) ................................................................ 31

*Acco Brands, Inc. v. Micro Security Devices, Inc.*,
    346 F.3d 1075 (Fed. Cir. 2003) ........................................................ 42, 43

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc*
    262 F.3d 1258 (Fed. Cir. 2001) ........................................................ 39, 40

*C.R. Bard., Inc. v. United States Surgical Corp.*,
    388 F.3d 858 (Fed. Cir. 2004) ................................................................ 37

*Corp. v. Multi-Tech Systems, Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) .............................................................. 38

*Cybor Corp. v. FAS Technologies, Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) .............................................................. 20

*Envtl. Instruments, Inc. v. Sutron Corp.*,
    877 F.2d 1561 (Fed. Cir. 1989) .............................................................. 42

*Intex Recreation Corp. v. Metalast*,
    245 F.Supp.2d 65 (D.D.C. 2003) ........................................................... 25

*Johnson & Johntson Associates Inc. v. R.E. Service Co.*,
    285 F.3d 1046 (Fed. Cir. 2002) ........................................................ 42, 43

*Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*,
    793 F.2d 1279 (Fed. Cir. 1986) .............................................................. 18

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ............................................................................... 20

*Maxwell v. J. Baker, Inc*
    86 F.3d 1098 (Fed. Cir. 1996) ............................................................... 42

*Nystrom v. Trex Co.*,
    424 F.3d 1136 (Fed. Cir. 2005) .............................................................. 24

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005) .............................................................. 31

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...................................................... passim

*Sage Prods. Inc. v. Devon Indus., Inc.*,
    126 F.3d 1420 (Fed. Cir. 1997) .............................................................. 42

*Texas Digital Systems, Inc. v. Telegenix, Inc.*
    308 F.3d 1193 (Fed. Cir. 2002) .................................................... 1, 24, 25

*Torpharm, Inc. v. Ranbaxy Pharmaceuticals, Inc.*,
    336 F.3d 1322 (Fed. Cir. 2003) .............................................................. 30

iii

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ........................................................................... 29

*Wilson Sporting Goods v. Hillerich & Bradsby Co.*,
  442 F.3d 1322 (Fed. Cir. 2006) ......................................................................... 16

*Wright Flow Control Corp. v. Velan, Inc.*,
  438 F.3d 1374 (Fed. Cir. 2006) ......................................................................... 46

**Statutes**

28 U.S.C. § 636.............................................................................................. 1, 20

35 U.S.C. § 121............................................................................................ 11, 45

**Regulations**

Fed. R. Civ. P. 72 ......................................................................................... 1, 20

## I.        INTRODUCTION

Pursuant to LCvR 72.2(b), Fed. R. Civ. P. 72, and 28 U.S.C. § 636, Plaintiff Intex

Recreation Corp. ("Intex") respectfully submits these Objections to Magistrate Judge Deborah A.

Robinson's Order entered on March 28, 2008 ("the Order"), construing the claims of United

States Patent No. 6,793,469 ("the '469 patent").  Specifically, Intex objects to the Magistrate's

construction for the following two disputed claim terms: "socket" and "pump body."

The Magistrate Judge's Order relies on an incorrect claim construction methodology set

forth in *Texas Digital Systems, Inc. v. Telegenix, Inc.*,[1] by starting at the outset with the broadest

dictionary definition, and then consulting the specification of the patent to determine whether

there is any language in the patent that would narrow that definition.  The Federal Circuit,

however, sitting en banc in *Phillips v. AWH Corp.*,[2] explicitly overruled the approach set forth in

*Texas Digital*, and instructed that the claim construction process must always start with the

patent specification and then consult the prosecution history, the proceedings before the U.S.

Patent and Trademark Office ("Patent Office").  *Phillips* further cautioned that, while extrinsic

evidence such as dictionary definitions may be considered, it must always be considered after the

claim term is interpreted in light of the intrinsic record, or else the process will "systematically

cause the construction of the claim to be unduly expansive."[3]

Reverting to the overruled *Texas Digital* approach to claim construction, the Magistrate

Judge incorrectly construed the claim terms "socket" and "pump body" by assigning those terms

the meaning given by the broadest conceivable dictionary definitions, despite the inconsistency

---

[1] 308 F.3d 1193 (Fed. Cir. 2002).

[2] 415 F.3d 1303 (Fed. Cir. 2005) (en banc).

[3] *Id.* at 1321.

of these extrinsic interpretations with the ordinary meaning of those terms in the context of the patent specification and the prosecution history.

Specifically, the Magistrate Judge erred in construing "pump body" according to the broadest conceivable dictionary definition to mean "the main part of the pump," which finds no support in the intrinsic record.  In contrast, Intex's proposed construction of "a housing that surrounds the other components of the pump" is the meaning supported by the specification and the prosecution history of the '469 patent.  Not only does the specification use the term "body" to refer to an outer shell, but in both the prosecution history for the '469 patent and in the prosecution history of a closely related Team Worldwide Corp. ("TWW") patent that shares the same specification, TWW explicitly defined "pump body" to mean a "housing" and "a body that contains a pump."  The public is entitled to rely on TWW's representations to the Patent Office as to the meaning of the term "pump body" that it used to obtain allowance of the patent, and consequently TWW's litigation-driven construction should be rejected.

The Magistrate Judge also erred by construing the claim term "socket" according to the broadest dictionary definition as "an opening or hollow that forms a holder for something," which again finds no support in the intrinsic record and is so broad that it encompasses even a bowl of paper clips or a bookshelf.  In contrast, Intex's proposed construction of "a structure that fits and holds onto an inserted part so that the structure and the part are detachably connected to each other" is the meaning that is supported by the '469 patent's specification, which repeatedly emphasizes that the socket provides a detachable connection that fits and holds onto an inserted pump.  Intex's construction is also consistent with the ordinary usage of "socket"—just like a light bulb socket—and is further supported by both the prosecution history and the proper dictionary definitions.

Intex thus requests that the Court reject the erroneous definitions and interpret the disputed claim terms of the '469 patent in view of the patent specification and prosecution history, as advocated by Intex.

## II.    FACTUAL BACKGROUND

### A.    The '469 Patent Specification

On September 21, 2004, the Patent Office issued the '469 patent, which is entitled "Inflatable Product Equipped with Pump."  The "Summary of the Invention" section of the '469 patent specification summarizes the alleged invention as providing an electric pump detachably connected to a socket:

> The airbed of the present invention includes an inflatable body, a socket, an electric pump and a battery case.  The socket is built in the airbed.  The electric pump is detachably connected to the socket to pump the airbed.  The battery case is also built into the airbed for ease of loading batteries that supply the electric pump with power.[4]

The specification of the '469 patent discloses ten different embodiments.  The first seven embodiments (shown in Figs. 2-12) disclose a "socket" and a detachable pump ("the socket embodiments"), and the last three embodiments (shown in Figs. 13-15) disclose a chamber having a motor and a fan inside ("the chamber embodiments").  As described further in Section B.1 below, the issued claims of the '469 patent are all directed to the "socket" embodiments since they claim a "socket" and not a "chamber."  During prosecution of the '469 patent, the Patent Office Examiner required TWW to cancel claims directed to the "chamber" embodiments and pursue those in a separate patent application.

---

[4] Declaration of David M. Ruddy dated June 12, 2007 (Dkt. No. 141-21, hereinafter "Ruddy Decl."), Ex. A, '469 Patent at col. 1, ll. 30-35.

### 1.    The Socket Embodiments (One Through Seven) All Describe a Socket That Fits and Holds onto a Detachable Pump

In the '469 patent specification, the first seven embodiments—the socket embodiments—all describe a "socket" that fits and holds onto a detachable pump, just like a light bulb socket fits and holds onto a light bulb.  In each embodiment, the detachable nature of the pump is highlighted and serves an essential purpose in allowing the mattress to be deflated.

The first embodiment is shown in Figs. 2 and 3A below.  This socket embodiment includes a "detachable electric pump 20" and a "built-in socket 24" that fits and holds onto the pump.[5]  To inflate the airbed 26, "[t]he electric pump 20 is fitted into the socket 24 and then rotated so that the electrode 202 of the electric pump 20 physically contacts the electrode 242 of the socket 24."[6]  This causes the electric pump 20 to turn on and pump outside air into the airbed 26.[7]



FIG. 2                    FIG. 3A

As shown in Fig. 3A above, when the pump 20 is fully inserted into the socket 24, the main portion of the pump 20 is outside of the airbed 26, with only a thin tube protruding into the socket 24.  The O-ring 242 in the socket 24 or on the pump 20 ensures a tight fit and prevents the

---

[5] *Id.*, col. 2, ll. 50-52.

[6] *Id.*, col. 2, l. 66 – col. 3, l. 1.

[7] *Id.*, col. 3, ll. 1-3.

airbed 26 from leaking.[8]  The user must detach the electric pump 20 from the socket 24 to deflate

the airbed 26.[9]

The second "socket" embodiment is shown in Figs. 4 and 5 below.  This embodiment

also discloses "a detachable electric pump 30" with a tight-fitting connection to a "built-in socket

34."[10]  To inflate the airbed, "the electric pump 30 is fitted into the socket 34" and rotated.[11]

Again, to deflate the airbed, the electric pump 30 must be detached, "fitted in reverse" into

socket 34, and rotated.[12]



FIG. 4

FIG. 5

The third embodiment is depicted in Figs. 8A-E of the '469 patent.  As shown in Figs. 8B

and 8C below, to inflate the airbed, the electric pump 42 is inserted in the socket 46 and rotated

so that "the electric pump 42 and the socket 46 are firmly connected together."[13]  To deflate the

[8] *Id.*, col. 3, ll. 3-4.

[9] *Id.*, col. 3, ll. 4-9.

[10] *Id.*, col. 3, ll. 10-13.

[11] *Id.*, col. 3, ll. 31-35.

[12] *Id*., col. 3, ll. 46-59.

[13] *Id.*, col. 4, ll. 44-50.

airbed, the electric pump 42 must be "fitted in reverse into the socket 46," which causes it to pump air from inside the airbed to the outside.[14]



The fourth through seventh embodiments are all similar variations of the tight-fitted socket and detachable pump embodiments described above.  They all describe a detachable pump that is fitted into a socket and rotated to firmly connect the pump to the socket through a set of interlocking flanges and grooves (embodiments four through six), or threads that allow the pump to be screwed into the socket like a light bulb (embodiment seven).[15]  These embodiments also include a rubber pad 522 or 574 on the pump to prevent leaking of air by ensuring a tight fit between the pump and the socket.[16]  In each embodiment, the pump must be detached to deflate the airbed.[17]

---

[14] *Id.*, col. 4, ll. 61-65.

[15] *See id.*, col. 4, l. 66 – col. 5, l. 60 and Figs. 9A-E (fourth embodiment); *id.*, col. 5, l. 61 – col. 6, l. 3 and Figs. 10A-B (fifth embodiment); *id.*, col. 6, ll. 4-11 and Fig. 11 (sixth embodiment); *id.*, col. 6, ll. 12-25 and Figs. 12A-12Bb (seventh embodiment).

[16] *Id.*, col. 5, ll. 38-40; *id.*, col. 6, ll. 19-22.

[17] *Id.*, col. 5, ll. 52-54.

### 2.    The "Chamber" Embodiments (Eight Through Ten) All Have a Fan and a Motor Mounted in a Nondetachable Chamber

In marked contrast to the seven "socket" embodiments, embodiments eight through ten refer to a "chamber" or a "housing."  As described further below, instead of using a detachable pump inserted into a tight-fitted socket, the chamber embodiments have a permanently installed (i.e., nondetachable) chamber or housing that contains a motor and a fan.  Whereas the socket embodiments deflate the airbed by detaching and then reversing the orientation of the pump, the chamber embodiments deflate the airbed by maintaining the pump in the same location and simply reversing the direction of rotation of the motor and the fan.

The eighth embodiment is shown in Fig. 13A below.  The airbed 80 has "a chamber 84, a fan 81 received in the chamber 84, [and] a motor 82 for rotating the fan 81, . . . ."[18]  To inflate the airbed, the user pushes the switch 83 to actuate motor 82 and fan 81, which pumps outside air into the airbed.[19]  To deflate the airbed, the motor 82 and fan 81 are rotated in reverse.[20]



FIG. 13A

---

[18] *Id.*, col. 6, ll. 26-29.

[19] *Id.*, col. 6, ll. 38-39.

[20] *Id.*, col. 6, ll. 43-46.

The ninth embodiment is shown in Fig. 14 below.  A motor 92 and a fan 91 with helical blades are located in a housing 93.[21]  As with the other chamber embodiments, the motor and fan are rotated in one direction to inflate the airbed, and in the reverse direction to pump air out of the airbed.[22]



FIG. 14

The tenth embodiment is shown in Fig. 15 below.  A first fan and motor 100 and a second fan and motor 200 are housed in different chambers to form two separate pumps.[23]  In inflating operation, the first fan and motor 100 is actuated to pump the airbed while the second fan and motor 200 is at rest.[24]  In deflating operation, the second fan and motor 200 is actuated (spinning in the reverse direction) to pump air out of the airbed.[25]  While the '469 patent states that "[t]he first and second fans and motors 100, 200 are permanently or detachably connected to the airbed,"[26] there is no suggestion that the chambers be detachably coupled, the fans and motors

---

[21] *Id.*, col. 6, ll. 50-53.

[22] *Id.*, col. 6, ll. 59-65.

[23] *Id.*, col. 6, l. 66 – col. 7, l. 1.

[24] *Id.*, col. 7, ll. 6-8.

[25] *Id.*, col. 7, ll. 8-11.

[26] *Id.*, col. 7, ll. 2-3.

are not detached for the purpose of deflating the airbed, and there is no tight-fit as in the socket

embodiments.



FIG. 15

Lastly, the concluding paragraph in the specification contains boilerplate language that

appears in virtually every patent under the sun, stating that "it is to be understood that the

invention is not limited to the disclosed embodiments."[27]   A search of U.S. patents since 1976 on

the Patent Office website reveals that 1,889,687 patents contain the phrase "invention is not

limited to the embodiments" and 36,636 patents incorporate the phrase "invention is not limited

to the disclosed embodiments."[28]   Other patents include variants of the same language.

**B.      The Prosecution History of the '469 Patent**

**1.      During the Prosecution of the '469 Patent and Related Patents, TWW
Repeatedly Defined "Pump Body" as the Pump Housing**

During prosecution of the '469 patent and during prosecution of a related TWW patent

that shares the identical specification to the '469 patent, TWW repeatedly defined the term

"pump body" as the pump "housing" in its representations to the Patent Office.   For example, in

an Office Action dated February 11, 2003, the Patent Office Examiner rejected claims 17 and 18

(which were later renumbered as claims 14 and 16 when the '469 patent issued) based on the

---

[27] *Id.*, col. 7, ll. 15-17.

[28] Search performed on http://patft.uspto.gov/netahtml/PTO/search-adv.htm, the Patent Office full-text and image
database.

following prior art device illustrated in Figs. 1A and 6 of U.S. Patent No. 5,890,882 to Feldman ("Feldman"):[29, 30]



Figs. 1A and 6 of Feldman above show an electric pump, called an "inflator," surrounded by an inflator housing 2.  In order to overcome the Examiner's rejection, TWW argued that in the Feldman device, "the inflator housing 2 (*i.e., pump body*) will be located outside the valve."[31]  TWW thus used "i.e." to define the pump body as the housing, as one would normally use the term "body"—just like an automobile body or the body of a hand drill.  At the same time, TWW amended claims 17 and 18, to add a limitation that the electric pump must include a "pump body" and it must be "wholly or partially located in the socket"[32]:

---

[29] *See* Ruddy Decl., Ex. B, '469 Patent Prosecution History, at TWW 000260-61.

[30] *See* Ruddy Decl., Ex. E, U.S. Patent No. 5,890,882 to Feldman at Figs. 1A and 6.

[31] *See* Ruddy Decl., Ex. B, '469 Patent Prosecution History, at TWW 000292.

[32] *See id*. at TWW 000289-290.

Claim 17 (currently amended) An inflatable product including:

    an inflatable body;

    a socket built in the inflatable body;

    an electric pump, including a pump body and an air outlet, connected to the socket to pump
the inflatable body, wherein the pump body is wholly or partially located in the socket;

Claim 18 (currently amended) An inflatable product including:

    an inflatable body;

    a socket built in the inflatable body;

    an electric pump, including a pump body and an air outlet, connected to the socket to pump the
inflatable body, wherein the pump body is wholly or partially located in the socket, a portion of
the electric pump is inserted into the socket, and the portion of the electric pump and the socket
are matched with each other to prevent an air leakage therebetween.

(Underlined terms are those terms added by amendment.)  TWW urged that Feldman's device

differed from TWW's invention because TWW's invention required that the pump must have a

housing (i.e., pump body) that is wholly or partially located in the socket.

Similarly, in TWW's closely related "continuation" application, Ser. No. 10/647,814

("the '814 application") that shares the identical specification to the '469 patent and almost

identical claims to claims 14 and 16 of the '469 patent, TWW specifically represented to the

Patent Office that the term "pump body" means "a body that contains a pump" when attempting

to overcome the Patent Office's rejection over the Feldman device:

> It is Applicant's view that the rejection depends upon a construction of the
> claim that conflicts with the broadest reasonable meaning of "pump body"
> in light of the specification.  Namely, as recited in claim 2 and described
> in the specification, the "**pump body**" is one element of an electric pump.
> Given the plain meaning of the words as read in light of the specification,
> **this element refers to a body that contains a pump**.  It does not refer to
> the entire electric pump, or to every part of an electric pump necessary to
> accomplish the objective of inflating a bladder.[33]

TWW further argued that Feldman's "inflator housing" is the pump body, whereas Feldman's

adapter is not the pump body because "the pump is disposed within the inflator housing, not the

---

[33] *See* Ruddy Decl., Ex. H, Appl. No. 10/647,814 Prosecution History, Amendment dated May 10, 2005, at 6
(emphases added).

adapter."[34]   And, to avoid the Examiner's rejection of TWW's claims over U.S. Patent No.

4,678,014 to Owen et al. ("Owen"), TWW argued that the pump body in Owen was the "molded

housing."[35]   TWW thus repeatedly defined the term "pump body" as the pump housing in its

representations to the Patent Office.

> ## 2.   After the Patent Office Examiner Required TWW to Select Either the Chamber Claims or the Socket Claims, TWW Canceled the Chamber Claims and Pursued Only the Socket Claims

During the prosecution of the '469 patent, the Patent Office Examiner also required

TWW to choose to prosecute either the chamber claims or the socket claims, and in response,

TWW canceled the chamber claims and pursued only the socket claims.  The '469 patent was

filed at the Patent Office on October 4, 2001, with eighteen original claims, thirteen of which

(claims 1-11, 17 and 18) expressly required a "socket."[36]  For example, original claim 17 recited

"a socket built in the inflatable body" and "an electric pump connected to the socket to pump the

inflatable body."[37]

The other claims (12-16) were all directed to embodiments eight through ten, the

chamber embodiments.  For example, original claim 12 recites "a chamber," "a fan received in

the chamber," and "a motor connected to the fan for rotating the fan in a first direction" for

inflation and "rotating the fan in a second direction" for deflation.[38]  Original claim 14 was

directed to "a method of inflating and deflating the inflatable product" by changing the direction

of rotation of the fan, as described in the specification for the chamber embodiments eight

---

[34] *Id.* at 6-7.

[35] *Id.* at 9; *see also* Ruddy Decl., Ex. I, Owen Patent at Fig. 8.

[36] Ruddy Decl., Ex. B, '469 Patent Prosecution History, Originally Filed Claims at TWW 000175-78.

[37] *Id.* at TWW 000178.

[38] *Id.* at TWW 000177.

through ten.[39]  Lastly, claims 15 and 16 were directed to the dual-chamber embodiment of Fig. 15 (the tenth embodiment) that uses two pumps, one for inflating and one for deflating.[40]

In a first Office Action on April 22, 2002, the Patent Office Examiner issued a "Restriction Requirement" under 35 U.S.C. § 121.[41]  The Patent Office issues a Restriction Requirement when there are "two or more independent and distinct inventions . . . claimed in one application," and thus the Patent Office "require[s] the application to be restricted to one of the inventions."[42]  In this case, the Examiner found that original claims 1-18 were directed to four unrelated inventions and, thus, required TWW to choose only one of the following sets of claims to pursue: (i) **Invention I**:  claim 14 (method of inflating and deflating by changing the direction of rotation); (ii) **Invention II**:  claims 1-11, 17, and 18 (the socket embodiments); (iii) **Invention III**:  claims 12-13 (chamber embodiments); and (iv) **Invention IV**:  claims 15 and 16 (the two-pump chamber embodiment).[43]

In support of the Restriction Requirement, the Examiner noted that Invention II (the socket claims) was unrelated to Invention III (the chamber claims) because "they have different modes of operation."[44]  Specifically, the socket claims "inflate[] and deflate[] by reversing the orientation of the motor" (i.e., the pump is detached and then turned around in the opposite direction), while the chamber claims "reverse[] the direction of rotation of the motor."[45]

---

[39] *Id.*

[40] Id. at TWW 000178.

[41] *Id.* at TWW 000244-248.

[42] 35 U.S.C. § 121.

[43] Ruddy Decl., Ex. B, '469 Patent Prosecution History, at TWW 000246; *see also id.* at TWW 000175-178 (originally filed claims).

[44] *Id.* at TWW 000247.

[45] *Id.*

In response to the Restriction Requirement, TWW elected Invention II, the socket claims, (claims 1-11, 17, and 18) and canceled all of the chamber claims.[46]  TWW later filed a related "divisional" patent application, Ser. No. 10/459,690, with the identical specification that pursued the chamber claims 12 and 13.[47]  That "chamber" application is still currently pending at the Patent Office and has not fared well.  It has been pending for almost five years and the Patent Office has rejected it *eight* times as being anticipated or obvious over *thirteen* different prior-art references.[48]

> **3.    During Prosecution, Both TWW and the Examiner Consistently Equated Structures That Fit and Hold onto a Detachable Pump with the Claim Term "Socket"**

During prosecution of the '469 patent, TWW and the Examiner both consistently used the term "socket" to refer to structures that fit and hold onto a detachable part, just like a light bulb socket.  For example, as discussed above in Section II.B.1, the Examiner rejected TWW's "socket" claims based on the Feldman device.[49, 50]  In rejecting TWW's claims over Feldman, the Examiner equated valve 52 in the Feldman device with the claimed "socket," and TWW agreed with the Examiner's characterization.[51]  As can be seen in Feldman's Fig. 6A shown in Section II.B.1 above, valve 52 in the Feldman device is a structure that fits and holds onto a detachable pump.

---

[46] *Id.* at TWW 000249-50.

[47] *See* Accompanying Declaration of Edward J. Naidich dated Apr. 11, 2008 (hereinafter "Naidich Decl."), Ex. A, As-filed claims of U.S. Patent Application Ser. No. 10/459,690, filed on June 11, 2003.

[48] *See* Naidich Decl., Ex. B, Excerpts from the Prosecution History of U.S. Patent Application Ser. No. 10/459,690, including Office Action rejections dated 2/6/04, 4/11/05, 12/6/05, 3/16/05, 3/16/06, 2/26/07, 10/16/07, and 2/11/08.

[49] *See* Ruddy Decl., Ex. B, '469 Patent Prosecution History, at TWW 000260-61.

[50] *See* Ruddy Decl., Ex. E, U.S. Patent No. 5,890,882 to Feldman at Figs. 1A and 6.

[51] Ruddy Decl., Ex. B, '469 Patent Prosecution History, at TWW 000260; *id.* at TWW 000292.

In a subsequent Office Action dated January 13, 2004, the Examiner again rejected TWW's "socket" claims as being obvious over the "valve 12" in the admitted prior art shown in Fig. 1A of the '469 patent and the "coupling structure" device in Fig. 5 of U.S. Patent No. 5,503,618 to Rey ("Rey"):[52, 53]



In rejecting TWW's claims for a second time, the Examiner equated "valve 12" in the admitted prior art device in Fig. 1A above with the claimed "socket" and, as can be seen, the valve 12 is a structure that fits and holds onto detachable pump 14.[54]  Similarly, the Examiner referred to the opening 40 of the coupling structure 36 in the Rey patent as a "socket" and, as can be seen in Fig. 5 above, the coupling structure 36 tightly fits and holds onto a detachable pump 34.[55]  Thus, both the Examiner and TWW consistently referred to structures that fit and hold onto detachable parts as "sockets," and never once referred to a "chamber" (a device that does not fit and hold onto a detachable part) as a "socket."

### C.    The Asserted Claims 14-17 of the '469 Patent

TWW asserts claims 14-17 of the '469 patent.  Independent claims 14 and 16 are reproduced as follows (with the disputed claim terms highlighted):

---

[52] *Id.* at TWW 000327-28.

[53] Ruddy Decl., Ex. F, Rey Patent at Fig. 5.

[54] Ruddy Decl., Ex. B, '469 Patent Prosecution History, at TWW 000327.

[55] *Id.* at TWW 000328.

14.   An inflatable product including:
         an inflatable body;
         a *socket* built in the inflatable body;
         an electric pump, including a ***pump body*** and an air outlet,
connected to the socket to pump the inflatable body, wherein the
***pump body*** is wholly or partially located in the *socket*;
         a connector provided on the electric pump for connecting an
external power to actuate the electric pump.

16.   An inflatable product including:
         an inflatable body;
         a *socket* built in the inflatable body;
         an electric pump, including a ***pump body*** and an air outlet, connected
to the *socket* to pump the inflatable body, wherein the ***pump body*** is
wholly or partially located in tile [sic: the] socket, a portion of the electric
pump is inserted into tile [sic: the] *socket*, and the portion of the electric
pump and the *socket* are matched with each other to prevent an air leakage
therebetween.

Claims 15 and 17 depend, respectively, from claims 14 and 16.  Other than the different

dependencies, those claims are identical:

[15/17.]  The inflatable product as claimed in claim [14/16], wherein the
pump body can be received partially or wholly in the socket in a first direction for
inflating the inflatable body, and received in a second direction for deflating the
inflatable body.

**D.    The Accused Intex Products**

A brief description of the Intex pumps accused of infringement is provided below to

provide context for the dispute between the parties as to their respective claim construction

positions.[56]  Indeed, an overview of the accused products and the parties' respective infringement

positions provides useful context as to why TWW seeks an improperly expansive definition of

"socket" to include "an opening" and "a holder for something," and why TWW seeks a broad

and nebulous definition of "pump body" to mean "the main part of the pump."

---

[56] *See Wilson Sporting Goods v. Hillerich & Bradsby Co*., 442 F.3d 1322, 1326-27 (Fed. Cir. 2006) ("knowledge of
[the accused] product or process provides meaningful context for the first step of the infringement analysis, claim
construction.")

The pertinent features of Intex's pumps are illustrated in the figures below:[57]



**INTEX AIR PUMP**
**(with Cutaway Section)**



**INFLATED INTEX AIRBED**

---

[57]     The relevant products in this action are those containing pumps with the model numbers 619RW and 619RL, and another series with the model numbers AP619, 639, and 626R.

The top photograph above shows a cutaway of the internal components of the accused Intex pump.  The accused Intex pump is permanently installed in the air mattress and is not detachable.  Nor does it have any detachable parts.  The lower photograph shows an inflated Intex air mattress.  The pump is not inserted into a socket or any other structure.

Intex's inflatable air mattress products are intended for consumer use, and the pump itself is not intended or designed for consumer disassembly—which would require not only unscrewing multiple components from one another, but also disconnecting multiple electrical connections.  Indeed, in the "WARNING" and "CAUTION" sections of the instructions that accompany the products, the user is specifically cautioned against removing parts.  The instructions state:

> **Servicing of a double-insulated product requires extreme care and knowledge of the system, and should be done only by qualified service personnel.**
>
>             \*   \*   \*
>
> No air pump maintenance is required.[58]

Asserted independent claims 14 and 16 of the '469 patent both require that the "pump body is wholly or partially located in the socket."  This claim limitation, as well as all other claim limitations, must be satisfied in order for the claims to be found infringed.[59]  Yet, as can be seen, there is no socket or any other structure in which the pump body is located.  Given this quandary, TWW manufactures a strained and untenable infringement position by (i) pursuing excessively broad constructions of the terms "socket" and "pump body"; and (ii) artificially slicing up the accused pump into arbitrary parts and calling one part a socket and the other part a pump body.  Below are two photographs showing a cutaway of the accused pumps that illustrates TWW's infringement theory:

---

[58]  *See* Ruddy Decl., Ex. G, Intex Owner's Manual.

[59]  *See, e.g., Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1282 (Fed. Cir. 1986).



Specifically, as shown above, TWW slices the pump into two arbitrary parts: (i) the rear portion of the housing (colored yellow in the above right photograph); and (ii) the front portion of the housing (the housing faceplate) plus the motor and the fan (colored red).  TWW then asserts that the rear portion of the housing is the claimed "socket," even though it bears no remote relationship to any of the sockets disclosed in the '469 patent nor to any structure that one would normally consider a socket, like a light bulb socket.  TWW, however, urges that "socket" is simply an "opening" or "a holder for something," and encompasses even a housing or chamber like that shown above, and thus contends that the sliced-up rear portion of the housing must be a socket.

TWW also asserts that the claimed "pump body" is comprised of the parts colored red, because, as TWW urges, "pump body" simply means the "main part of the pump." TWW contends that this broad and nebulous definition gives it license to point to various arbitrary components and label the collective group the "main part of the pump," even going so far as to slice up the housing and label the front portion the "pump body," and the rear portion, the

"socket."[60]  As demonstrated below, however, TWW's strained interpretation is undermined by the '469 patent specification and the prosecution history.

## III.    ARGUMENT

### A.    Standard of Review

Under LCvR 72.2(c), 28 U.S.C. § 636 (b)(1)(A) and Fed. R. Civ. P. 72(a), a district judge may modify or set aside any portion of a magistrate judge's ruling where it has been shown that the magistrate judge's order is "clearly erroneous or contrary to law." Claim construction is purely a question of law and is reviewed de novo, including any underlying factual issues.[61]

### B.    The Magistrate Judge Explicitly Followed the Claim Construction Methodology of *Texas Digital*, Which Has Been Overruled by *Phillips*

The Magistrate Judge explicitly followed the incorrect claim construction methodology set forth in *Texas Digital*, which has been explicitly overruled by *Phillips* because it incorrectly elevated the prominence of dictionary definitions over the "intrinsic" evidence of the patent. Intex respectfully submits that had the Magistrate Judge followed the methodology set forth in *Phillips*, she would have arrived at the claim constructions proposed by Intex that are grounded in the specification and the prosecution history of the '469 patent, rather than being based on the broadest conceivable dictionary definitions.

#### 1.    *Phillips* Overruled the Dictionary-Based Approach of *Texas Digital*

*Phillips* is the en banc Federal Circuit's most recent and definitive guide to the proper methodology of claim construction, and in particular, the proper role of "intrinsic" evidence (the specification and the prosecution history of the patent) as compared to "extrinsic" evidence.  As

---

[60] *See, e.g.*, TWW's Memorandum in Support of Its Renewed Motion for Partial Summary Judgment of Noninfringement, dated April 9, 2008 (Dkt. No. 146-2) at 11-12.

[61] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372  (1996); *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) ("we therefore reaffirm that, as a purely legal question, we review claim construction de novo on appeal including any allegedly fact-based questions relating to claim construction.")

the *Phillips* court instructed, the "words of a claim 'are generally given their ordinary and customary meaning,'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."[62]   "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."[63]  *Phillips* instructed that the claims and the specification of the patent are the most important evidence in construing claims, followed by the prosecution history of the patent, which is the complete record of proceedings before the Patent Office.  The "specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of the disputed term.'"[64]

"In addition to consulting the specification, . . . a court 'should also consider the patent's prosecution history, if it is in evidence.'"[65]  "Like the specification, the prosecution history provides evidence of how the [Patent Office] and the inventor understood the patent."[66]  However, "because the prosecution history represents an ongoing negotiation between the [Patent Office] and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."[67]  Nevertheless, the prosecution history may be consulted to determine "whether the inventor

---

[62] 415 F.3d at 1312-13 (citations omitted).

[63] *Id.*

[64] *Id.* at 1315 (citation omitted).

[65] *Id.* at 1317 (citation omitted).

[66] *Id.*

[67] *Id.*

limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."[68]

Lastly, "extrinsic" evidence, which consists of all evidence external to the patent and prosecution history such as dictionaries and treatises, "can shed useful light on the relevant art," but is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'"[69]  *Id.*  Extrinsic evidence is viewed "as less reliable than the patent and its prosecution history in determining how to read claim terms, for several reasons."  For example, the extrinsic evidence is not "created at the time of the patent prosecution," it "may not reflect the understanding of a skilled artisan in the field of the patent," it may be "generated at the time and for the purpose of litigation and thus can suffer from bias," and because "[i]n the course of litigation, each party will naturally choose the pieces of extrinsic evidence most favorable to its cause, leaving the court with the considerable task of filtering the useful extrinsic evidence from the fluff."[70]  "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of the patent claim scope unless considered in the context of the intrinsic evidence."[71]

After setting forth the proper order in which intrinsic and extrinsic evidence should be considered, and their relative significance, the en banc *Phillips* court then explicitly rejected the *Texas Digital* approach of starting with the broadest dictionary definition at the outset, and then only narrowing that broad dictionary definition if something could be found in the specification that explicitly narrowed the scope of the term:

---

[68] *Id.*

[69] *Id.*  (citation omitted).

[70] *Id.* at 1318.

[71]  *Id.* at 1319.

While the [*Texas Digital*] court noted that the specification must be consulted in every case, it suggested a methodology for claim interpretation in which the specification should be consulted only after a determination is made, whether based on a dictionary, treatise, or other source, as to the ordinary meaning or meanings of the claim term in dispute.  Even then, recourse to the specification is limited to determining whether the specification excludes one of the meanings derived from the dictionary, whether the presumption in favor of the dictionary definition of the claim term has been overcome by "an explicit definition of the term different from its ordinary meaning," or whether the inventor "has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." 308 F.3d at 1204.  In effect, the *Texas Digital* approach limits the role of the specification in claim construction to serving as a check on the dictionary meaning of a claim term if the specification requires the court to conclude that fewer than all the dictionary definitions apply, or if the specification contains a sufficiently specific alternative definition or disavowal. . . .  That approach, in our view, improperly restricts the role of the specification in claim construction.[72]

Instead of this dictionary-based approach, the Federal Circuit instructed that the specification must be both the starting point and the "single best guide" to the meaning of the disputed claim term, the specification acting itself as a dictionary to define the claim terms either expressly or by implication:

Assigning such a limited role to the specification, and in particular requiring that any definition of claim language in the specification be express, is inconsistent with our rulings that the specification is "the single best guide to the meaning of a disputed term," and that the specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."[73]

"The main problem with elevating the dictionary to such prominence," the Federal Circuit explained, "is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."[74]  "[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term

---

[72] *Id.* at 1320 (citations omitted).

[73] *Id.* at 1320-21.

[74] *Id.* at 1321.

to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."[75]

The problem with the *Texas Digital* line of cases, the Federal Circuit elaborated, is that "if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive."[76]  "The risk of systematic overbreadth is greatly reduced if the court instead *focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down*."[77]

Noting that "[d]ictionaries, by their nature, provide an expansive array of definitions," the Federal Circuit warned that "[a] claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another."[78]  Lastly, the Federal Circuit noted that "authors of dictionaries or treatises may simplify ideas to communicate them most effectively to the public and may thus choose a meaning that is not pertinent to the understanding of particular claim language."[79]

The Federal Circuit has similarly rejected broad claim constructions that were based on dictionary definitions rather than being grounded in the specification and prosecution history, even where those claim terms were simple terms.  For example, in *Nystrom v. Trex Co.*,[80] the

---

[75] *Id.*

[76] *Id.*

[77] *Id.* (emphasis added).

[78] *Id.* at 1321-22.

[79] *Id.*

[80] 424 F.3d 1136 (Fed. Cir. 2005).

Federal Circuit rejected a broad dictionary definition of the claim term "board" because "[t]he written description and prosecution history consistently use the term 'board' to refer to wood decking materials cut from a log."[81]

> 2.     **The Magistrate's Order Explicitly Follows the Rejected *Texas Digital* Approach to Claim Construction**

The Magistrate's Order explicitly follows the dictionary-focused approach of *Texas Digital*—and *Intex Recreation Corp. v. Metalast*,[82] which itself heavily relies on *Texas Digital*—that was rejected and overturned by *Phillips*.  Specifically, the Magistrate's Order starts at the outset with a "presumption in favor of a dictionary definition," and only then looks to see if there is an *explicit* definition in the specification that contradicts the broad dictionary definition:

> "Dictionary definitions . . . are valuable resources to be used by a court at any time to assist in determining the ordinary meaning of claim language."  [*Intex Recreation Corp. v. Metalast*, 245 F. Supp. 2d 65, 69 (D.D.C. 2003).] (citations omitted).  "Because words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Texas Digital Sys.*, 308 F.3d at 1203 (citations omitted).  "[T]he *presumption in favor of a dictionary definition will be overcome where the patentee*, acting as his or her own lexicographer, has clearly set forth an *explicit* definition of the term different from its ordinary meaning." *Id.* at 1204 (citations omitted).[83]

The above approach, advocated by TWW and adopted by the Magistrate, has been directly and explicitly overruled by *Phillips*:

> While the [*Texas Digital*] court noted that the specification must be consulted in every case, it suggested a methodology for claim interpretation in which the specification should be consulted only after a determination is made, whether based on a dictionary, treatise, or other source, as to the ordinary meaning or meanings of the claim term in dispute.  Even then, recourse to the specification is limited to determining whether the specification excludes one of the meanings derived from the dictionary, [or] *whether the presumption in favor of the*

---

[81] *Id.* at 1143-45.

[82] 245 F.Supp.2d 65, 69-70 (D.D.C. 2003).

[83] 3/28/08 Order at 4.

*dictionary definition of the claim term has been overcome by "an explicit definition of the term different from its ordinary meaning*," . . . .  That approach, in our view, improperly restricts the role of the specification in claim construction.

Assigning such a limited role to the specification, *and in particular requiring that any definition of claim language in the specification be express*, is inconsistent with our rulings that the specification is "the single best guide to the meaning of a disputed term," and that the specification "acts as a dictionary when it expressly defines terms used in the claims *or when it defines terms by implication*."[84]

As explained further below, the Magistrate followed this incorrect dictionary-based approach when construing the terms "socket" and "pump body."  In so doing, the Magistrate's Order improperly elevated the significance of dictionary definitions over the intrinsic record, the specification, and the prosecution history.

**C.     The Magistrate Judge's Order Incorrectly Construes "Pump Body" (All Claims)**

| Magistrate Judge's Construction | Intex's Proposed Construction | TWW's Proposed Construction |
|---|---|---|
| the main part of the pump (Order at 9.) | a housing that surrounds the other components of the pump | the main part of the pump |

The dispute between the parties regarding "pump body" centers on the issue of whether "pump body" should be given its ordinary and customary meaning in the context of the '469 patent specification and prosecution history, as advocated by Intex, or whether "pump body" should be construed based on the broadest possible dictionary definition without regard to the specification, as urged by TWW.

Intex follows below the procedure set forth in *Phillips* of starting with the specification and the language of the claims, then addressing the prosecution history, and only after considering the intrinsic evidence, considering the extrinsic evidence such as dictionary

---

[84] *Phillips*, 415 F.3d at 1321-22 (emphases added).

definitions.  When this procedure is followed, Intex submits that the proper construction of

"pump body" is "a housing that surrounds the other components of the pump."  As an alternative,

if the Court chooses to adopt TWW's construction of "main part of the pump," Intex requests

that the Court clarify that the "main part of the pump" includes the pump housing.[85]  This result

is mandated by the intrinsic evidence, since not only does the specification use the term "body"

to refer to an outer shell, but TWW repeatedly defined the term "pump body" to mean a

"housing" and "a body that contains a pump" in its representations to the Patent Office when it

added the term to the claims.

        **1.**      **The Language of the Asserted Claims Indicates That the Pump Body Is One Component of the Pump**

The claim language at issue specifically requires "an electric pump, including a pump

body and an air outlet, connected to the socket to pump the inflatable body."  The term

"including" means that the "pump body" and "air outlet" are both components of the "electric

pump."  This supports Intex's construction that the "pump body" is a component of the pump,

that is, the housing that surrounds the other components of the pump.

        **2.**      **The Specification of the '469 Patent Uses the Term "Body" to Refer to an Outer Shell and the Figures of the Specification Contradict TWW's Proposed Construction**

TWW added the term "pump body" to original claims 17 and 18 (corresponding to issued

claims 14 and 16) by amendment to overcome a rejection over the prior art during prosecution.[86]

While the term "pump body" does not appear anywhere in the specification, the term "body"

_____

[85] The Magistrate Judge's Order is unclear in this regard.  *See* 3/28/08 Order at 9-10.

[86] Ruddy Decl., Ex. B, '469 Patent Prosecution History, at TWW 000289-90; *see also* Section II.B.3, *supra*.

does appear in the specification several times in the phrases "body 40 of the airbed"[87] and "body 50 of the airbed,"[88] referring to elements 40 and 50 shown below in blue:



As can be seen above, the term "body" in "body 40 [50] of the airbed" is clearly referring to the outer shell of the airbed. It is not being used to refer to the "main part" of the airbed, as TWW would urge, since there is no "main part" as distinguished from a "subsidiary part" of the airbed. Thus, the specification makes clear that "body of the airbed" means the outer shell of the airbed and, likewise, "pump body" similarly means the outer shell of the pump. This is the ordinary and customary meaning of "pump body," just like an "auto body" is the shell or housing that surrounds an automobile, and the body of a hand drill is the housing that surrounds the other components of the drill.

Furthermore, the '469 patent specification also directly contradicts TWW's definition of "pump body." The embodiment shown in Fig. 3A of the '469 patent below illustrates that the "main part" of the pump 20 is completely *outside* of the socket, with only a thin tube located in the socket. TWW's proposed construction of "main part of the pump," excludes the preferred embodiment shown in Fig. 3A from the scope of the claims, because the claims require that "pump body is wholly or partially located in the socket." Thus, TWW's proposed construction

---

[87] Ruddy Decl., Ex. A, '469 Patent, col. 4, l. 13; *id.*, col. 4, ll. 33-34; *id.*, col. 4, l. 52.

[88] *Id.*, col. 5, l. 27.

must fail because a claim interpretation that excludes a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support" to be sustained.[89]



FIG. 3A

Under Intex's proposed construction, however, the claims do not exclude the preferred embodiment because the "pump body"—i.e., the housing—is clearly "partially located in the socket." Thus, the specification of the '469 patent strongly supports Intex's construction because (i) the specification uses the term "body of the airbed" to refer to the outer shell; and (ii) Intex's proposed construction does not exclude the preferred embodiment from the claims.

### 3.    The Prosecution History of the '469 Patent Defines "Pump Body" as a Housing

TWW implicitly defined "pump body" in distinguishing the claims over the prior art, and in repeatedly accepting the Examiner's construction of what this term means relative to each of the prior art devices identified by the Examiner. The public is entitled to rely upon this kind of intrinsic evidence in ascertaining the scope of the '469 patent claims, and the courts have long used this kind of objective evidence in construing the ordinary meaning of a patent's claim

---

[89] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

language.  As the Federal Circuit in *Torpharm, Inc. v. Ranbaxy Pharmaceuticals, Inc.*,[90] explained:

> Whether the patentee chooses to dispute the examiner's view of matters is relevant to claim interpretation, for there a court may need to ascertain exactly what subject matter was actually examined and allowed by the Patent Office.  Patent examination would serve little purpose unless the scope of the exclusive patent right correlated with the matter allowed by the [Patent Office].  Accordingly, in ascertaining the scope of an issued patent, the public is entitled to equate an inventor's acquiescence to the examiner's narrow view of patentable subject matter with abandonment of the rest.  Such acquiescence may be found where the patentee narrows his or her claims by amendment, or lets stand an examiner's restrictive interpretation of a claim, . . . .[91]

In this case, TWW expressly defined the claim term "pump body" during prosecution by using the phrase "inflator housing 2 (i.e., pump body)" in describing the following prior art Feldman device:



As shown above, Feldman discloses a pump with several components, such as a housing 2 and an outlet 7.  The housing 2 surrounds other components of the pump, such as a fan 12 and a motor 8.  In comparing the housing 2 in Feldman with the claim term "pump body," TWW used the phrase "inflator housing 2 (i.e., pump body)."[92]  In the context of the '469 patent, the

---

[90] 336 F.3d 1322 (Fed. Cir. 2003).

[91] *Id.* at 1330 (citations omitted).  *See also Fuji Photo Film Co. v. Int'l Trade Comm'n*, 386 F.3d 1095, 1100 (Fed. Cir. 2004).

[92] *See* Ruddy Decl., Ex. B, '469 Patent Prosecution History, Amendment dated July 11, 2003, at TWW 000292.

public is entitled to rely upon TWW's use of "i.e." in assessing the ordinary meaning of "pump body."

Moreover, holding TWW to its contemporaneous use of the term "i.e." to overcome a question of patentability is an interpretive result both recognized by and supported in Federal Circuit precedent.  In *Abbott Laboratories v. Novopharm Ltd.*,[93] the Federal Circuit held that the use of "i.e." indicated that the patentee had acted as its own lexicographer in defining a claim phrase.[94]  There, the intrinsic record failed to provide any support for a construction of the disputed claim term other than the construction linked to the patentee's use of "i.e."[95]  As in *Abbott*, the intrinsic record of the '469 patent fails to provide any support for a construction of "pump body" other than a housing that surrounds the other components of a pump, like the "housing 2" in the Feldman device that TWW linked to the term "pump body" by using the term "i.e."  Accordingly, the public should be entitled to rely upon TWW's use of "i.e." in defining "pump body" as the housing 2 in Feldman that surrounds the other components of the pump.

The implications of TWW's clarity on this point justify direct application of the identical principle to this case.  The "pump body" in Intex's devices is the pump housing, just as the "housing" in the prior art Feldman device is the pump body, as shown in the following illustration:

---

[93]  323 F.3d 1324 (Fed. Cir. 2003).

[94]  *Id.* at 1327.

[95]  *Id.*; *see also Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1373 (Fed. Cir. 2005) (summarizing the facts and holding in *Abbott*).



**PUMP BODY**

In parrying inquiries and objections from the Examiner, the applicants during the '469 patent

prosecution consistently engaged in dialog that acknowledged the ordinary meaning of "pump

body" as the housing that surrounds the other components of a pump, and they accepted this

recognized meaning throughout their arguments from one type of pump to various other types of

pumps.  TWW should not now be allowed to erase this consistent prosecution history by turning

this clear line of interpretation upside down and claim that a "pump body" is merely the main

part of the pump.

> **4.     The Ordinary Meaning of "Pump Body" as a Housing That
> Surrounds the Other Components of the Pump Is Confirmed by the
> Prosecution History of TWW's Closely Related Application**

Moreover, the plain meaning of "pump body" as "a housing that surrounds the other

components of the pump" is further confirmed by TWW's own representations to the Patent

Office in the closely related "continuation" application, Ser. No. 10/647,814 ("the '814

application") that shares the identical specification to the '469 patent and nearly identical claims.

As TWW itself agrees, statements made in the prosecution histories of TWW's related patent

applications are relevant in interpreting the claim terms in the '469 patent such as "pump body"

because the claim terms must be interpreted consistently across the related applications.[96]

---

[96] Defendant TWW's Memorandum in Support of Its Motion for Claim Construction, dated June 12, 2007 (Dkt. No. 140) at 18-19, citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005); *see also*

(continued on next page)

During prosecution of the '814 application, TWW specifically represented to the Patent Office that the term "pump body" means a "body that contains a pump" when arguing to overcome a prior art rejection which involved, again, the Feldman patent:

> It is Applicant's view that the rejection depends upon a construction of the claim that conflicts with the broadest reasonable meaning of "pump body" in light of the specification.  Namely, as recited in claim 2 and described in the specification, the "**pump body**" is one element of an electric pump. Given the plain meaning of the words as read in light of the specification, **this element refers to a body that contains a pump**.  It does not refer to the entire electric pump, or to every part of an electric pump necessary to accomplish the objective of inflating a bladder.[97]

TWW further argued that Feldman's "inflator housing" is the pump body, whereas Feldman's adapter is not the pump body because "the pump is disposed within the inflator housing, not the adapter."[98]  And, to avoid the Examiner's rejection of TWW's claims over U.S. Patent No. 4,678,014 to Owen et al. ("Owen"), TWW argued that the pump body in Owen was the "molded housing."[99]  In other words, TWW's newly minted definition of "pump body" as "the main part of the pump" contradicts its own representations to the Patent Office at a time when obtaining the '469 patent would have been considered an open question.  What the applicants said at the time is therefore highly material and they are bound by it, now as then.  Ultimately, the public is entitled to rely on TWW's representations to the Patent Office as to the meaning of the term "pump body" and consequently their contemporaneous representations take complete precedence over any current litigation-driven construction.

---

(continued from previous page)

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed.Cir.2004) (holding that statements made in prosecution of one patent are relevant to the scope of all related patents).

[97] *See* Ruddy Decl., Ex. H, Appl. No. 10/647,814 Prosecution History, Amendment dated May 10, 2005, at 6 (emphases added).

[98] *Id.*

[99] *Id.* at 9; *see also* Ruddy Decl., Ex. I, Owen Patent at Fig. 8.

5.      **TWW's Proposed Construction of "Main Part of the Pump" Is Vague and Nebulous**

The difficulties with TWW's post hoc litigation-driven claim construction are compounded by TWW's failure to articulate how "the main part of the pump" differs from any other component of the pump.  TWW's vague and nebulous construction allows it to slice Intex's accused pump into arbitrary parts, as discussed in Section II.D, *supra*, and point to arbitrary and disparate components as "the main part of the pump" without any rationale for doing so.  One of ordinary skill in the art reading the specification and claims of the '469 patent would readily understand that a "pump body" is not some ethereal "main part of the pump," but rather the housing of the pump, in accordance with the intrinsic record.

D.      **The Magistrate Judge's Order Incorrectly Construes "Socket" (All Claims)**

| Magistrate Judge's Construction | Intex's Proposed Construction | TWW's Proposed Construction |
|---|---|---|
| an opening or hollow that forms a holder for something (Order at 8.) | a structure that fits and holds onto an inserted part so that the structure and the part are detachably connected to each other | an opening or hollow that forms a holder for something |

The dispute between the parties regarding "socket" centers on two related issues: (1) whether "socket" should be given its ordinary and customary meaning in the context of the '469 patent specification, as advocated by Intex, or whether "socket" should be based on the broadest dictionary definition, as advocated by TWW; and (2) whether TWW's attempt to construe "socket" so broadly ("a holder for something") that it would include even a bookshelf, is consistent with the use of the term "socket" in the '469 patent and the prosecution history.

In construing the claim term "socket," the Magistrate's Order adopts the approach urged by TWW of starting with the broadest possible dictionary definition, and then only consulting the specification to determine if there is anything that would limit the broadest dictionary

34

definition.[100]  Agreeing with TWW's dictionary-based approach, the Magistrate Judge explained that she "carefully considered the intrinsic evidence, *including* the dictionary definitions," even though dictionary definitions are *extrinsic evidence* and significantly less favored than the intrinsic evidence.[101]  The Magistrate's Order concludes that "the embodiments in the '469 patent do not limit the claims," and adopts TWW's broad dictionary definition.[102]  In contrast, the Magistrate's Order rejects the correct approach mandated by *Phillips* of starting by reviewing the specification, then consulting the prosecution history, and only at the very last step, consulting extrinsic evidence such as dictionary definitions.[103]

Under TWW's broad dictionary definition for the term "socket"—an opening or hollow that forms a holder for something—a bowl of paper clips, a coat pocket, a desk drawer, a bowl, a cup, a kitchen sink, a bucket, a gas tank, a flowerpot, and a trash can would all qualify as a socket.  Yet none of those items could seriously be considered a "socket" within the context of the '469 patent.  Scores of other equally inappropriate examples would be covered by TWW's definition for the same reason that they are all devoid of the context and limitations that the '469 patent specification and prosecution history highlight as one of skill in the field seeks to read and understand the claims.  The intrinsic evidence establishes the context for what constitutes the ordinary meaning of "socket" in the context of the '469 patent and exposes TWW's construction as entirely unsupportable.

As detailed below, the proper approach to construing "socket," as mandated by *Phillips*, is to begin by consulting the specification and the language of the claims, then consulting the

---

[100] Order dated Mar. 28, 2008, at 7-8.

[101] *Id.* at 8.

[102] *Id.*

[103] *Id.* at 6-7.

prosecution history, and only then consulting the extrinsic evidence as the last step.  Intex submits that following this procedure produces the proper construction of socket: "a structure that that fits and holds onto an inserted part so that the structure and the part are detachably connected to each other."

If the Court, however, should decide that using a dictionary definition is appropriate, Intex submits that there are two more apt definitions and proposes as an alternative that socket be construed to mean a "device designed to receive and grip the end of a tubular object, such as a tool or pipe"[104] or "[a]n opening or a cavity into which an inserted part is designed to fit: *a light bulb socket.*"[105]

> ### 1. The '469 Patent Specification and the Language of the Claims Use the Term "Socket" to Refer to a Structure That Fits and Holds onto a Detachable Part

As described below, the ordinary and customary meaning of "socket" in the context of the '469 patent specification and claims is a structure that fits and holds onto an inserted part so that the structure and the part are detachably connected to each other.  This ordinary and customary meaning of socket is consistent with what one normally thinks of as a "socket"—just like a light bulb socket.  TWW's broad construction of an "opening" or "a holder for something" finds no support in the specification or the claims.

> ### a) The '469 Patent Claims and Specification Repeatedly Indicate That the Pump is "Fitted Into" the Socket and That the Socket Holds onto the Pump

The language of the '469 patent claims and the specification consistently use the term "socket" as a structure that fits and holds onto an inserted part, which in this case is the claimed

---

[104] *See* Ruddy Decl., Ex. K, McGraw-Hill Dictionary of Scientific and Technical Terms 1853 (5th ed. 1994).

[105] *See* Ruddy Decl., Ex. J, American Heritage College Dictionary 1292 (3d ed. 1997).

"electric pump," so that the structure and the part are detachably connected to each other.

Notably, the language of asserted independent claims 14 and 16 requires "an electric pump . . .

*connected to* the socket."  Moreover, each of the seven pump-and-socket embodiments disclosed

in the '469 patent repeatedly makes clear that the pump is "fitted into,"[106] "fitted in,"[107] "put

in,"[108] or "screwed together"[109] with the socket.[110]  Quite simply, the claim language and the

specification establish that the socket must fit and hold onto the inserted pump, much like a light

bulb socket fits and holds onto an inserted light bulb.

In each of the seven "socket" embodiments, the "socket" fits and holds onto the inserted

pump to connect the pump and socket together.  The "holding onto" is accomplished,

alternatively, by inserting and rotating the pump into the socket, and using rotation to engage

coupling structures, such as flanges or threads, which are integrally formed in the socket and in

the pump.[111]  Every "socket" device disclosed in the '469 patent has these coupling structures.

### b)    The Only Disclosed "Socket" Devices in the '469 Patent Specification Require a Detachable Connection

The "Summary of the Invention" in the '469 patent's specification provides that the

"airbed of the present invention" includes a "pump" that is "*detachably connected* to the socket

to pump the airbed."[112]  Of all the parts of the specification, the "Summary of the Invention"

section assumes a special significance in construing the claims.  *See, e.g., C.R. Bard., Inc. v.*

*United States Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the

---

[106] *See* Ruddy Decl., Ex. A, '469 Patent, col. 2, ll. 66, col. 3, ll. 31-32, and col. 5, l. 37.

[107] *Id.* at col. 3, l. 46, and col. 4, l. 61.

[108] *Id.* at col. 4, l. 44.

[109] *Id.* at col. 6, ll. 17, 22.

[110] *See also id.* at col. 2, ll. 66-67, col. 3, ll. 18-19 and 61-63, col. 4, l. 31, col. 5, ll. 12, 31-32, and Figs. 2-12.

[111] See *supra* p. 6 & note 15.

[112] Ruddy Decl., Ex. A, '469 Patent, col. 1, ll. 30-33 (emphasis added).

invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term" and "are more likely to be found in certain sections of the specification, such as the Summary of the Invention.").[113]

Moreover, the detachable nature of the connection is recited throughout the specification:

- "a first embodiment of the present invention is provided with a <u>detachable</u> electric pump";[114]

- "[i]n [sic] deflating operation, the user <u>detaches</u> the electric pump";[115]

- "an airbed of a second embodiment of the present invention is provided with a <u>detachable</u> electric pump";[116]

- "the electric pump 30 is <u>detachable</u> from the socket";[117]

- "[i]n the deflating operation [of the third embodiment], the electric pump 42 is <u>fitted in reverse</u> into the socket"—implying that detachability of the pump is requisite;[118]

- "[i]n the deflating operation [of the fourth through sixth embodiments], the electric pump 52 is <u>reversely disposed</u>"—from which, a person of skill would understand that detachability of the pump is requisite;[119] and

- Figs. 12A and 12B—showing uniform axial threads on both opposing sides of the pump body—reveal that the seventh embodiment also is detachable from the socket and reversible.[120]

Every embodiment that uses the term "socket" confirms that the socket provides a detachable connection, as stated in the "Summary of the Invention," and the specification

---

[113] *See also Microsoft Corp. v. Multi-Tech Systems, Inc*., 357 F.3d 1340, 1347-49 (Fed. Cir. 2004) ("Those statements, some of which are found in the 'Summary of the Invention' portion of the specification, are not limited to describing a preferred embodiment, but more broadly describe the overall inventions of all three patents.").

[114] *See* Ruddy Decl., Ex. A, '469 Patent, col. 2, ll. 50-52 (emphasis added).

[115] *Id.* at col. 3, ll. 4-5 (emphasis added).

[116] *Id.* at col. 3, ll. 10-12 (emphasis added).

[117] *Id.* at col. 3, ll. 42-43 (emphasis added).

[118] *Id.* at col. 4, ll. 61-62 (emphasis added).

[119] *Id.* at col. 5, ll. 52-53 (emphasis added).

[120] *Id.* at Figs. 12A-12B.

emphasizes that an important distinguishing feature of a "socket" is the need for a detachable

connection, and more specifically, a structure that fits and holds onto the inserted pump.  In

contrast, none of the "chamber" devices in Figs. 13-15 use a socket that that fits and holds onto

an inserted pump so that the structure and the pump are detachably connected to each other.[121]

> c)      **In the Context of the '469 Patent Specification, a "Socket" Is Fundamentally Different from a "Chamber"**

Consistent with the claims and the specification, Intex's construction of "socket"

excludes the chamber embodiments in the '469 patent that do not include a structure providing a

detachable connection and that fits and holds onto an inserted pump.  Unlike the seven "socket"

devices in Figs. 2-12, the term "socket" is never used to describe the "chamber" devices in Figs.

13A-15.  Instead, the term "chamber" only is used to describe the "chamber" devices.[122]  This

distinction is significant for purposes of claim construction, as it dictates that the appropriate

construction for "socket" should exclude a mere "chamber" and an "opening or hollow," as

TWW proposes to construe this term.

The facts in this case parallel those in *Bell Atlantic Network Services, Inc. v. Covad*

*Communications Group, Inc.*[123]  There, the Federal Circuit gave a narrow construction to the

claim term "mode" because "the patentees, throughout the specification, use the terms 'rate' and

'mode' to refer to separate and distinct concepts," and, thus, the Court concluded that those two

terms must be construed to have different meanings.[124]  The Court reasoned that "when a

patentee uses a claim term throughout the entire patent specification, in a manner consistent with

---

[121] Again, while the tenth embodiment is described as having fans and motors that may be detachably or permanently attached, the pump itself (which includes the pump body or housing) is not detachable.

[122] *See* Ruddy Decl., Ex. A, '469 Patent at col. 6, l. 26 – col. 7, l. 11.

[123] 262 F.3d 1258 (Fed. Cir. 2001).

[124] *Id.* at 1270.

only a single meaning, he has defined that term 'by implication.'"[125]  As in *Bell Atlantic*, TWW,

throughout the '469 patent specification, uses the terms "socket" and "chamber" to refer to

separate and distinct concepts, as shown in the following Figs. 2 and 13A of the '469 patent:



As shown in Fig. 2, the '469 patent specification discloses a socket 24 that fits and holds

onto a detachable pump 20.  By contrast, as shown in Fig. 13A, the '469 patent specification

discloses a "chamber" that houses several components, such as a fan 81 and a motor 82.  In

describing the "socket" embodiments, the '469 patent specification uses the term "socket"

seventy-four (74) times, but *never* uses this term to describe any aspect of the "chamber"

embodiments.  In the context of the '469 patent specification, a "socket" is fundamentally

different from a "chamber."  And like the specification in the patent at issue in *Bell Atlantic*, the

'469 patent specification defines the claim term "socket" by implication in a manner consistent

with only one meaning.[126]

By attempting post hoc to expand the meaning of "socket" to encompass an "opening or

hollow that forms a holder for something," which encompasses even a bowl or a bookshelf,

---

[125] *Bell Atlantic*, 262 F.3d at 1271.

[126] *See also Phillips*, 415 F.3d at 1321 ("[T]he specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.'")(citation omitted).

TWW improperly seeks to escape the ordinary meaning of the term "socket" and the only interpretation supported by the use of the term "socket" found throughout the '469 patent specification, in direct contravention of the notice function of the patent disclosure and the guidelines clarified by the Federal Circuit in *Phillips*.

> **2.     The Prosecution History of the '469 Patent Further Demonstrates That the Ordinary Meaning of "Socket" in the Context of the '469 Patent Is a Structure That Fits and Holds onto a Detachable Part**

The prosecution history of the '469 patent further demonstrates that the ordinary and customary meaning of "socket" in the context of the '469 patent is a structure that fits and holds onto an inserted and detachable part.  Specifically, the Examiner issued a Restriction Requirement because TWW's originally filed "socket" claims were so "independent" and "distinct" from its originally filed "chamber" claims as to require prosecution in separate patent applications.[127]  In response, TWW canceled the chamber claims and chose to pursue only its "socket" claims in the application that led to the '469 patent.[128]  As a result, TWW specifically chose not to pursue the "chamber" embodiments, and instead claimed the "socket" embodiments in the application that became the '469 patent.  From the standpoint of public disclosure and reliance, the "chamber" embodiments are not covered by the '469 patent claims.

In *Johnson & Johntson Associates Inc. v. R.E. Service Co.*,[129] the Federal Circuit, sitting en banc, held that the disclosure dedication rule precluded a patentee from asserting that certain disclosed, but unclaimed, embodiments could be infringed.  There, the patent at issue claimed "a sheet of aluminum" and disclosed that other materials "such as stainless steel or nickel alloys

---

[127] *See* Ruddy Decl., Ex. B. '469 Patent Prosecution History, Paper No. 3, at TWW 000246-47.

[128] *Id.*, Response to Restriction Requirement, at TWW 000249-50.

[129] 285 F.3d 1046 (Fed. Cir. 2002).

may be used."[130]   The Federal Circuit rejected the patentee's attempt to expand a claim reciting

"aluminum" to cover the disclosed, but unclaimed, "stainless steel and nickel alloy"

embodiments based on the disclosure dedication rule.[131]   As the Federal Circuit explained:

> [W]hen a patent drafter discloses but declines to claim subject matter, as in this case, this action dedicates that unclaimed subject matter to the public. Application of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would "conflict with the primacy of the claims in defining the scope of the patentee's exclusive right."[132]

And as recognized in *Maxwell v. J. Baker, Inc*[133] the Federal Circuit has "frequently" applied this

"rule to prohibit a finding of literal infringement when an accused infringer practices disclosed

but unclaimed subject matter."[134]

Similarly, in *Acco Brands, Inc. v. Micro Security Devices, Inc.*,[135] the Federal Circuit

refused to allow a patent's claims to be broadened to cover a disclosed, but unclaimed,

embodiment that, like the case here, resulted from a Restriction Requirement under 35 U.S.C. §

121.[136]   There, the Restriction Requirement issued because the original claims were drawn to two

different embodiments, which were so "independent and distinct" from one another as to require

prosecution in separate patent applications.   In response, the patent owner chose to pursue claims

drawn to only the first embodiment in a separate divisional patent application that became the

patent-in-suit.   In light of the Restriction Requirement, the Federal Circuit held that the presence

---

[130] *Id.* at 1055.

[131] *Id.*

[132] *Id.* at 1054 (quoting *Sage Prods. Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997)).

[133] 86 F.3d 1098 (Fed. Cir. 1996).

[134] *Id.* at 1107 (citing *Envtl. Instruments, Inc. v. Sutron Corp.*, 877 F.2d 1561, 1564 (Fed. Cir. 1989)).

[135] 346 F.3d 1075 (Fed. Cir. 2003).

[136] *Id.* at 1079.

of a disclosed, but unclaimed embodiment "does not serve to broaden the scope of the [patent-in-suit's] claims that were the subject of the divisional application."[137]

In this case, as in *Johnson & Johnston* and *Acco Brands*, the presence of the disclosed, but not claimed, "chamber" devices in the '469 patent specification cannot serve to broaden the scope of "socket" and "pump" in the '469 patent claims 14-17.  These claims are drawn to the disclosed "socket" devices shown in Figs. 2-12, not the disclosed "chamber" devices shown in Figs. 13-15.  TWW is thus precluded from asserting that the "socket" and "pump" elements of claims 14-17 cover the disclosed, but not claimed, "chamber" devices.

For instance, the following illustration compares Intex's devices with the disclosed, but unclaimed, "chamber" device shown in Fig. 14 of the '469 patent:



As shown above, neither device includes a "socket" structure that fits and holds onto a detachable "pump," as required by the '469 patent claims 14-17.  TWW is thus precluded from recapturing the disclosed chamber embodiments, which were the subject of claims that TWW

---

[137] *Id.*  The first embodiment at issue in *Acco Brands* included a pin, which extends through a slot only after a locking member was rotated, and the second embodiment included a pin, which extends through the slot only before the locking member was rotated.  *Id.*

explicitly canceled and chose to pursue in a separate patent application that has been repeatedly

rejected by the Patent Office as not being novel and as being obvious.[138]

>   3.   The '469 Patent Prosecution History Supports Intex's Proposed
>        Construction That the Claimed "Socket" Is a Structure That Fits and
>        Holds onto a Detachable Pump

The prosecution of the '469 patent further supports Intex's proposed construction for the

ordinary and customary meaning of "socket," because both TWW and the Examiner repeatedly

referred to prior art structures that fit and hold onto detachable parts as "sockets," yet never once

referred to "an opening or hollow that forms a holder for something" as a "socket."  Nor did

TWW or the Examiner ever refer to a chamber like those disclosed in Figs. 13-15 of the '469

patent or used in the accused Intex product as a "socket."  For example, TWW and the Examiner

both characterized as "sockets": (i) "valve 52" in Fig. 6 of the Feldman patent; (ii) opening 40 of

coupling structure 36 in Fig. 5 of the Rey patent; and (iii) "valve 12" in Fig. 1A of the admitted

prior art in the '469 patent. [139]   As can be seen below, each of these structures fits and holds onto

a detachable pump.



Thus, the prosecution history further corroborates Intex's proposed construction of the ordinary

and customary meaning of "socket" as a structure that fits and holds onto an inserted part so that

the structure and the part are detachably connected to each other.

---

[138] See Section II.B.1, n. 40.

[139] *See* Ruddy Decl., Ex. B, '469 Patent Prosecution History, Office Action dated Feb. 11, 2003, at TWW 000260-61.

4.      **Extrinsic Evidence, Such as Pertinent Dictionary Definitions, Lends Further, Secondary Support for This Construction of "Socket".**

Recognizing that dictionary definitions are not evidentiary sources on par with the intrinsic evidence contained in the patent and its prosecution history, Intex's construction also is supported by the appropriate dictionary definitions of the word "socket"—definitions that are consistent with the specification and prosecution history.  For instance, two dictionary definitions of "socket" are "[a]n opening or a cavity into which an inserted part is designed to fit: *a light bulb socket*,"[140] and a "device designed to receive and grip the end of a tubular object, such as a tool or pipe."[141]  These dictionary definitions indicate that a socket must allow a part to be *inserted* and gripped, *fit* the part that is *gripped*, and allow the part to be detachable, *like a light bulb socket*.  Moreover, these dictionary definitions are fully consistent with the specification and prosecution history, as described above.  In contrast, TWW's dictionary definition of "an opening or hollow that forms a holder for something" finds no support in the patent specification or prosecution history.

5.      **TWW's Construction Is Not Supported By The Claim Language in a Different Patent, as TWW Advocates**

TWW's construction of socket is not supported by the use of the term "socket" in the claim of a different patent, U.S. Patent No. 6,332,760 ("the '760 patent"), as TWW contends.  Specifically, TWW points to a claim in the '760 patent, which recites that the pump is "detachably connected to the socket," and erroneously argues that Intex's proposed construction

---

[140] *See* Ruddy Decl., Ex. J, AMERICAN HERITAGE COLLEGE DICTIONARY 1292 (3d ed. 1997).

[141] *See id.*, Ex. K, MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1853 (5th ed. 1994).

of "socket" would render the word "detachably" redundant.[142]  This argument, a form of the

doctrine of "claim differentiation," fails for several reasons.

First, the doctrine of claim differentiation is a "limited tool of claim construction" and

"relying on claim differentiation cannot produce an inconsistent or contradictory result" with the

interpretation of the claims read in the context of the specification and the prosecution history.[143]

For example, in *Nystrom v. Trex Company, Inc.*, the Federal Circuit rejected the same argument

that TWW makes here.  Like TWW, the patentee in Nystrom urged that the claim term "board"

should be assigned the broadest dictionary definition, rather than "wood cut from a log," because

one of the claims in the patent specifically recited "a wood decking board."[144]  The Federal

Circuit rejected this argument because "[a]n examination of the term 'board' in the context of the

written description and prosecution history of the [patent in suit] leads to the conclusion that the

term 'board' must be limited to wood cut from a log."[145]

Moreover, the '760 patent is undergoing "reissue" proceedings at the Patent Office,

which will require the '760 patent to be surrendered.  In those reissue proceedings, the '760

patent reissue application has been repeatedly rejected by the Patent Office over five years and

has received a <u>Final</u> rejection.[146]  Thus, TWW's reliance on claim differentiation is especially

inapt in this case where it is relying on a claim term in a patent whose claims have been

repeatedly rejected.

---

[142] *See* Defendant TWW's Memorandum in Support of Its Motion for Claim Construction, 6/12/2007 (Dkt. No. 140) at 18-19.

[143] *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006).

[144] *Nystrom*, 424 F.3d at 1143.

[145] *Id.*

[146] See Naidich Decl., Ex. C, Excerpts from Prosecution History of Reissue Appl. No. 10/7477,814 including 3/1/2007 Office Action Rejection, 3/16/2007 Office Action <u>Final</u> Rejection, and 1/22/2008 Advisory Action Rejection.

IV.     **CONCLUSION**

For the reasons stated herein, and for the reasons set forth in Intex's Responsive Claim

Construction Br., Dkt. No. 141, which is incorporated herein by reference, Intex respectfully

requests that the District Judge interpret the disputed claim terms and phrase of the '469 patent in

the following manner:

1)  The term "socket" refers to "a structure that fits and holds onto an inserted part so
    that the structure and the part are detachably connected to each other."

2)  The term "pump body" is "a housing that surrounds the other components of the
    pump."

For purposes of all further proceedings, including instructions to the jury, pursuant to

Fed. R. Civ. P. 51, Intex respectfully asks this Honorable Court to adopt and apply the foregoing

claim constructions.


Dated: April 11, 2008                     Respectfully submitted,

                                          /s/Edward J. Naidich
                                          Gerald F. Ivey (#367009)
                                          Kara F. Stoll (#471166)
                                          Edward J. Naidich (#481649)
                                          John M. Williamson (#472713)
                                          FINNEGAN, HENDERSON, FARABOW,
                                            GARRETT & DUNNER, L.L.P.
                                          901 New York Avenue, N.W.
                                          Washington, D.C.  20001-4413
                                          (202) 408-4000

                                          *Attorneys for Plaintiff/Counterclaim-Defendant,*
                                          *Intex Recreation Corp.*

47

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2008, a copy of the foregoing PLAINTIFF INTEX
RECREATION CORP.'S OBJECTIONS TO THE MAGISTRATE JUDGE'S MARCH 28,
2008 ORDER PURSUANT TO LCvR 72.2(b) AND FED. R. CIV. P. 72 was served via
facsimile and E-Mail on the following counsel:

Kurt L. Glitzenstein, Esq.
Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110

Shari F. Esfahani, Esq.
Fish & Richardson P.C.
1425 K Street, N.W., Suite 1100
Washington, DC 20005

_____
Elizabeth Blackstone